It is Alberto Alvarado v. The Defendants, whose names I cannot pronounce. 24-20476. When you are ready, Mr. Lee, you can proceed. Thank you, Judge. May it please the Court, my name is Joshua Lee. I'm here for the appellant, Alberto Alvarado. Within moments of first boarding the Sapphire, Mr. Alvarado fell 15 feet down a ladder chute, breaking both legs in the fall. This was Alvarado's first day working aboard any vessel. And the jury, not the trial court, should have decided whether the crew of the Sapphire should have warned Mr. Alvarado about the presence of a transition platform that was unmarked from which he fell or otherwise made that platform safe. Likewise, the jury should have decided whether the circuit's Ruiz nine-factor test conclusively established that Mr. Alvarado was a borrowed servant of Jacinto Port, where he was employed by a company called Labor Finders. So the district court erred when it held there were no issues of fact as to the claims against both these defendants and granted summary judgment. But Alvarado, in his November deposition, November 7th of 2023, he twice clarified that the reason he fell through the hole was because he slipped. Yes, Your Honor. I don't remember him ever saying, oh, there was an unguarded hole. I thought he said, I slipped, it was wet. Is that fair to say? That's right, Your Honor. So it's a combination of things. So if you look at page 11 of Alvarado's brief, there's a diagram of the area. And so as he tried to transition off of the ladder onto that first platform, he took a half step back and then slipped, falling into that unmarked hole. He didn't realize that there was a transition platform there or that there was a second chute that he would have to traverse in order to get down to the cargo hold. Does he ever say that, though? Does he ever say, I didn't know there was another level to go down? I thought he just said, it was wet and I slipped. He did, Your Honor. In fact, after the incident, Third Officer Vitales of the vessel came to check on him. And it was at that time that Mr. Alvarado testified that he first learned of the separate sections in the ladder chute. That was on page 445 of the record. To pick up a little bit, my colleague is more familiar with that devastation than I am. Would you agree, from what I'm hearing as an implication, that he never says that in his deposition? That he never says in his deposition that this was the problem as opposed to just slipping? Well, he did say in his deposition that he only learned about the fact that there is a transition platform and two separate chutes at that record site I just mentioned, Your Honor, at 445 of the record. So that was the first time that he was warned, or really not warned, but learned that he had to negotiate these two separate chutes in order to get down to the cargo hold. And he was the first longshoreman that was told by anybody on the vessel to go down into the hold. What do you make of the standard we're to apply in assessing the Sapphire's turnover duty? It has to be a danger that's not open or obvious. Arguably here. Or a danger which a reasonably competent stevedore should anticipate encountering. This was his first time on any cargo ship. So isn't that the reason he was injured as opposed to what a reasonably competent stevedore would have expected? So two things on that, Your Honor. Number one, we have case authority and facts to show that that ladder chute and the way that it was oriented was not necessarily open and obvious because of the way that he was climbing down the ladder. His body obviously was, you know, he was negotiating the ladder in such a way that he would not have been able to see that there was a transition platform below him. Any lighting that was above him would have been blocked by his own body. And there's testimony that it was a foggy day, that there was condensation. Those issues don't necessarily make up the hazard. However, they do go to the open and obvious nature of the risk. Well, but even you say that foggy conditions, wet conditions, those things are common on ships. Yes, Your Honor. That sort of pulls the rug out a little bit, I guess, in terms of it not being open and obvious. It was foggy and it was wet. Well, it goes to the fact that the danger was concealed by those issues that would have obscured his knowledge of the open hole. And in this court, in the Manson Gulf case and in the McCuller case, held that where you have these conditions on ladders, they can be concealed by virtue of the vantage point that the stevedore has at the time of the incident. So when you're right on top of an unguarded hole, certainly one might make the argument it's open and obvious. But as you approach the hole, if your vantage point is such that it's only revealed to you when you're right above it, then in those cases, this court has held not open and obvious. And in any event, Your Honor, when a concealed hazard must be faced in order to get to the working area that the stevedore needs to go to, the circuit provides an exception to that open and obvious standard. What's the concealed hazard? Your rule of law would be any time a vessel's got two levels of ladders, they've got to gate it or at least warn. Is that what you're saying? Because that isn't what Manson Gulf says. Yes, Your Honor. The issue is that when you've got a—not all ladder chutes are like this, obviously. Because Manson Gulf wasn't even a ladder, right? They just cut a hole in the grate and they tell the person to go look for the oil up in the pipes and he steps through the grate. So the only ladder case that I could find was the Pansini one you cited. But Pansini, the problem was it was the wrong ladder. Here it's the right ladder. It goes to a second level, goes down. What's the negligent hazard that had to be warned about? Right, Your Honor. And I think the Pansini case is a good analog for this situation because what the lesson that we can draw from Pansini is that even a safe ladder that can be used for another purpose has to be— you have to provide warnings as to the proper usage of that ladder in order for it not to become a concealed hazard. So in that case, even though that ladder had a different purpose, it wasn't for accessing the hatch that the stevedore was attempting to do. Okay, so back on my question, though. Are you suggesting it's always a hazard that has to be gated or warned about if the vessel has enough depth that they need to have two levels of ladders? If there—certainly if it's a situation where there is a risk that there is a fall risk and that some reasonable steps can be taken in order to make that risk safer or to warn against it, then the ship must take action against it. I think you are saying yes. Every time a ship is designed to have two ladder levels— so in other words, it's not one precipitous long ladder. They're giving the people going down a moment to rest and get to the next. Every single one of those ships, that would be a negligent turnover unless it's gated or warned. Or is there something else here? Well, it's the combination of failing to provide a job hazard analysis to tell the stevedores coming on board, here's the way that the ship is oriented. Just to be able to provide, you know, when you're going to the cargo hold, here's what the ladder looks like, here's what to expect. If you need to have fall protection, make sure you get your fall protection. Providing those warnings is industry standard, and we've submitted a 40-year veteran's report and affidavit to show that that is something that should have been warned about prior to the stevedore arriving on the vessel and beginning their work activities. And so for that reason, they didn't have the benefit of that knowledge, regardless of whether it was the first day or not. Any other stevedore who's coming down the ladder on the day of the incident would have had to come across the same hazard, and if they're not expecting that there's an unguarded hole there, then they would have to face the risk just like anybody else. And if we look at page, I believe it's 515 of the record, you can see that there are other sections of this ladder where they do provide gates at other access points in this chute, which shows some evidence of knowledge that there is guarding necessary for certain parts of ingress and egress in this ladder. Is there evidence in the record that this ladder configuration was unique, odd, uncommon among cargo ships? No, Your Honor. It's not my understanding that it is an uncommon hazard. And if I may, going back to your point about whether it's open and obvious, in the plier case, when the use of a ladder is necessary in order to get to the working area that the stevedore has to get to, that is a situation where open and obvious or stevedore's knowledge is not relevant because it's necessarily the case that they have to use those conditions in order to get to do what they're doing. And so that is a recognized exception. So here the ladder that was necessarily used by Mr. Alvarado to get to the cargo hold is something that takes it out of the open and obvious analysis because he would have had to use it. Is it your position the stevedoring work had begun by the time he was injured? No, Your Honor. So he had arrived on the ship at about 7 in the morning, and this accident happened about 7.15, 7.20 in the morning, and he was the first person down the ladder. These cargo operations had not yet even occurred or even started, for that matter. Would the turnover duty even be implicated at that point? Well, I mean, I think it's implicated in the sense that the vessel had provided access to these longshoremen, and at that point since they're on the way to the working areas, they had in essence turned over part of that in the process of turning over the boat to the stevedores. And so I think that that is a situation where access is provided to the longshoremen, then you've got a turnover duty that's implicated. And speaking of the operation, Your Honor, this is the second point. Alternatively, even if the vessel has been partially turned over, the SAFIRE owed a duty to exercise reasonable care to avoid exposing longshoremen to harm in areas under the vessel's active control. The problem of the district court's analysis in this case is that the district court believed that what the standard to be is that the vessel needed to have active control over the stevedoring operations, and that's not the standard. That's one factor, but there is also another way to show active control, which is that the vessel retained control over a part of the vessel, whether that's a part of the vessel where the longshoremen would have to traverse in order to get to their working area or something that the evidence shows that the vessel retained control over. And in this case, the evidence shows that the SAFIRE crewman directed Mr. Alvarado to the ladder to get to the cargo hold and directed him how to do that, that 3rd Officer Vitalis of the SAFIRE was the first on scene to arrive at the bottom of the ladder to attend to Mr. Alvarado, which shows that he had not been denied access by the stevedoring company. In other words, they retained the right of access to that area. And finally, there's... On the active control, it does seem to me that it is agreed that the work that was to be done was in the hold of the ship. It was necessary to cross the deck of the ship, to come to these two ladders, to reach a lower level. I don't know if that was then the level at which the work was to be done. Do we know if this ladder was only for access to the hold of the ship, if the only work and workers using this ladder would be the longshoremen, of which the plaintiff was part of the crew? I'm just wondering how to define the work area and how, for your position, can you distinguish this ladder as not being uniquely part of the work area but of a broader access to the ship? I think the record evidence is that there were two access points to get to the cargo hold, two ladder chutes of similar orientation like the one that Mr. Alvarado was in. And so my understanding, Your Honor, from the record evidence, is that this ladder is the ladder to access the cargo hold. Anything else? If you look at the photographs, it does appear that there's a hatch from the top deck where you can access the ladder, which is the way that Mr. Alvarado accesses. But if you look down the hatch, and page 11 or a brief shows some of this vantage point, there are other ingress and egress points in the ladder chute. And I don't know the orientation of the ship necessarily, but there's other decks off of which you can come in and out of this ladder chute. It at least appears that way from the photographs. And so briefly before I conclude my time, Your Honor, I'd like to talk about the borrowed servant argument for just a second. As applied by the district court in this case, they simply did not credit the plaintiff's summary judgment evidence on the nine reason factors in this case. There is substantial evidence that as of the first day that Mr. Alvarado was on this vessel that Labor Finders' payroll employer had retained the bulk of control over his activities. The evidence shows that Labor Finders was responsible for training Mr. Alvarado, that their safety policies applied to him, and that Jacinto would provide no orientation, safety training, or even verify whether these Labor Finder employees were trained in order to do this work. That is not indicative of an employer or master-servant relationship. Traditionally, you would expect to see that an employer would provide that training, provide that supervision to make sure that their employees are competent to perform that work. And that is the control issue is what this Court has called the most universally important issue. However, some of these other factors, such as furnishing of tools, also provides support here because— In your brief, when you're arguing now Labor Finders, but the brief was mostly suggesting that it was the Sapphire crew that, quote, had control. To the extent that they were directing the— That wouldn't enhance Labor Finders at all. No, no, no, Your Honor. I agree with that. So really, to the extent that this was his first day, that there was limited contact with his employer, excuse me, with Jacinto Port, that relationship had not yet turned into a borrowed-servant relationship for a lack of control. He was led by Dela Cruz, who's a JCI employee, correct? And there's a factual dispute about whether he even met with him. So that's part of the reason why summary judgment needs to be reversed as to both of these defendants. Thank you, Your Honors. Good morning. My name is Bob Klawitter. I represent the owner and the manager of the cargo ship BBC Sapphire. There are a whole host of reasons why neither the turnover duty nor the active control duty were violated. Unfortunate accident involving somebody who should not have been on this job to begin with. It's a 68-year-old man who had never worked on a ship in his life. Can you talk a little— Yes. Thank you. I will, Your Honor. He had never been on a ship in his life. He had never been down a ladder like this in his life. The ladder was inspected by the ship's crew and by his foreman and by a port captain before anybody accessed this particular cargo hold. So the ship did exercise reasonable care. This is a standard fixed ladder, a fixed ladder to access a deep cargo hold. It's made out of steel. There's no allegation that there was any defect with the ladder itself, no suggestion that there was rust or a broken rung or a loose runner. The opposing counsel seems to acknowledge this as a standard form of ladder split with a platform halfway down. Is that shown in the record? There's nothing unusual about this configuration? There's nothing unusual, and the record reflects that, page 310, that this is a standard entrance with a straight ladder leading down to a landing standing platform. And as was noted during plaintiff's counsel's comments, it's a place because the hold is so deep where people can take a breather and rest a bit. Some of them have a gate, some don't? Some apparently do have gates, some don't. That's an issue of naval architecture, but the thing I think it's important for the court to understand is that this ship is U.S. Coast Guard inspected. It's a foreign flag vessel. It has to undergo Coast Guard inspection. It's also classed by one of the world's classification societies that confirms that its design meets the standards for cargo ships. It had been in service for eight years. This ladder had been used, no doubt, probably thousands of times by hundreds of people. It would have included crew members, stevedores, surveyors, inspectors, people who would have need to access the hold. There's no real authority, I agree, suggesting there's negligence in not warning about this disjointed ladder structure. On the other hand, both cases sort of peripherally are interesting because in Manson Gulf there was negligence, and yet the hole there was visible. It was on the surface. So if anything, this was a sort of less visible hole. Respectfully, I don't know that I would agree with that, Your Honor, because I think that in Manson, which Judge Southwick was involved in, there was a suggestion that depending upon your perspective, you might or might not be able to see the hole. These were modifications that had been made to a decommissioned platform in order to transport it. They weren't supposed to be there in a normal deck space. This ladder was exactly where it was supposed to be. It was being used for its intended purpose. Judge Wilson, you made a comment which I think is very crucial here. The standard, the SINDIA standard, speaks to a competent longshoreman, expert, experienced longshoreman. Mr. Alvarado, unfortunately, did not fit that description. The ladder was used before and after his insta by a variety of people. All vessel people. There were no longshoremen that used it before him. He was the first longshoreman. So it was people that knew the ship. The record reflects, Your Honor, that there was an inspection before he went down. But what does the inspection tell us? That doesn't really tell us whether this is an open and obvious hazard or not. I mean, he says it was not visible. It wasn't well lit. It was dark and it was foggy. And a number of comments along that line. Mr. Alvarado complained about dim lighting. He complained about fog. And he admitted that but for what he described as a foggy condition, which no one else saw, okay, there's no other testimony about there being fog. But for the fog, he would have seen the transition platform and been able to safely go down and not have an accident. And, Your Honor, that can be found. This is his twice saying, I slipped. It was my slip. This is his saying, it was my slip that I slipped. Yes, Your Honor, that he would have been able to see the transition platform and safely go down to the bottom level, but for what he described as dim lighting and foggy conditions. Well, of course, Fifth Circuit President, Circuit Court President, is very clear that those kinds of conditions are not actionable. And why is that? Because they're open and obvious to a competent longshoreman. And they're the kinds of thing that the stevedore is supposed to address. There are specific OSHA regulations cited in our brief that require the stevedore to provide adequate lighting. We believe the record reflects there was adequate lighting, but to the extent there wasn't, the stevedore had an affirmative obligation to do something about it. You accept that you did have a turnover duty once they were on the vessel? Yes, Your Honor. Your argument is just there's no hazard here at all. But you're not saying that there was no duty because he hadn't quite gotten to the cargo pulleys? This is my 45th year of handling these kind of cases. And the stevedore shows up at 7 o'clock. They have a toolbox safety meeting, and the guys go down in the hold and start working. That's what Mr. Alvarado was involved in doing. So the vessel had effectively been turned over. They had to go down the stairs, down the ladder, to get to the area where they were going to work. And the comment about there being different areas to access it, that's not entirely true. But if you look at the ladder, you'll see that there are different places you can exit the ladder well. And that's because as the hold fills up with cargo, people need to be able to get off at different levels to do what they're going to do to work. So, again, very standard setup here. The ladder was used immediately after the incident. Our mate went down to check on him. No one complained about there being any problem at all with the ladder. And, indeed, Jacinto Port Safety Specialist, after the incident, went down and examined it. The JPI superintendent, Stephen Orr superintendent, inspected it. They said there were no issues, that it was normal, that this was a routine activity, okay, which obviously it was for a competent and experienced law ensurement. And, again, we go full circle. That was the problem. Unfortunately for Mr. Alvarado, I respect the fact that he was out trying to work. This was during COVID. But he hired on through a labor service. They did nothing to train him. They gave him no instructions. There was no safety meeting held with his supervisor, okay. That's where the responsibility for this rests. And I would suggest, and the U.S. Supreme Court in the Howlett case addressed this, said that the responsibility for the safety of the law ensurement relates with the Stephen Orr who is best able to prevent injuries like this, okay, because of their expertise and because the OSHA regulations require them to do this. So, again, I think if you accept the plaintiff's position in this case, effectively he's almost trying to put an unseaworthiness burden back on the ship and he's trying to go back to before the 72 amendments to the Longshore Act because the thrust of that was to make the Stephen Orr primarily responsible for the safety of the longshoremen. And that's what all the OSHA citations relate to. Yes, Your Honor. No, I'm just trying to absorb. Any suggestion that I think the expert mentioned something about a safety gate and referenced the general OSHA standard? Does it apply? This court has found that foreign flag vessels that are inspected by the U.S. Coast Guard are not subject to the OSHA regulations. That's the Thomas versus Hercules case from 2018. It's very clear that we didn't have any obligation in that regard. Again, I think it's important as well that the plaintiff testified that he never spoke to a member of the ship's crew. The suggestion that we told him what to do, where to go, he testified at the record, pages 368 and 369, he had never even spoken with any member of the vessel's crew. He was instructed by his foreman to go down the ladder. He was instructed by his Stephen Orr foreman where he was going to work. That could be found at 382, 383, 368, 369 in the record. So there's no evidence that my clients, the breech defendants, breached a turnover duty with regard to active control. He had his own supervisor there. He never spoke to the ship's crew, and there's simply no basis for such a finding. What was the area of the work in your interpretation for active control? Did it include these ladders? Was that the area of the work, or was that still under the control of the ship because they served other purposes or for other reasons? He obviously was not going to be doing any cargo work in the ladder well. He had to use the ladder well to get to his work area. Just like he had to use the deck of the ship to get to the ladder. So I'm just wondering if there's anything different about the ladder than the deck of the ship insofar as whether it's part of the work area and whose responsibility it would be. If there had been a defect with the ladder, which there's no evidence of, that would rest with the vessel. Let me ask you maybe a narrower question. Are the ladders part of the work area for purposes of our analysis? Part of the work area because once the vessel is turned over, the longshoremen need to be able to access the cargo area. And if there's a problem, in fact, there's a specific OSHA regulation that prohibits the stevedore from allowing a longshoreman to use a visibly unsafe ladder. So, again, all of these issues are addressed by the regulations that apply to the entity best able to protect the longshoremen. All right, Counsel. Thank you. Thank you, Your Honor. May it please the Court. My name is George Catholish, and I represent Jacinto Port International in this matter. And first of all, and I'm going to be speaking on the borrowed servant issue, which is the only issue on appeal as to my client. This Court has been very clear that the borrowed servant, borrowed employee issue is an issue that can be addressed as a matter of law. And there are multiple opinions by this Court where summary judgments on that issue have been affirmed. It's also, and I'm talking about the Gaudet case, the Capp case, and the Melancon case. There are also cases that say that the issue can probably be raised on a motion for a summary judgment, even if not all the factors point towards a finding in favor of a borrowed employee. And the cases there are the Gaudet case and a whole slew of unpublished opinions by this Court where there's a few factors that are neutral, or one or two that may be against a finding of a borrowed employee, and the Court nevertheless affirms a summary judgment. So in that context, going through the factors, the nine Ruiz factors pretty quickly, whose work was being performed, factor number two, factor number five, did the original employer terminate his relationship with the employee, factor number eight, who had the right to discharge the employee, factor number nine, who had the obligation to pay the employee, all those cases are disposed of by the Capp's opinion, published opinion, and also by the Schauber and Melancon opinions. In this context, this is a special kind of borrowed employee case in the sense that this is a temporary staffing labor provider staffing company case. And those cases are unanimous in finding that in that context, the employee has been basically borrowed by the putative employer who's protected by workers' comp. So there are really very few issues to address here because there is no fact issue. There's no material fact issue on any of these points. Who furnished the tools? That's factor number six. Well, the evidence is that Jacinto Poore did provide the employee a vest and a hard hat. He had his own steel-toed boots and gloves. He never got to do any work, and so that issue is never quite developed. However, the uncontroverted evidence in the record is if he had gotten to the point where he was actually going to be performing stevedoring duties, the equipment wouldn't have been provided by the stevedore, which is my client, Jacinto. What does the record say? Who was supposed to train him? You heard prior counsel say this man had zero training. That, of course, is a crux of probably what happened in the sense that I think both labor fighters has a duty to provide a reasonably competent person that can be a general laborer. I guess I'm just wondering is your argument, okay, he's our employee. We borrowed him. We gave him the tools. That's why workers' comp protects us. But at the same time, you're saying, but they had to train him? We didn't have any duty to train him how to go down a ladder? We're not taking that position because it's clear that it's a combination of both. Labor fighters have to provide some basic training. I mean, the big question, Your Honor, is— Well, no, just stick with my question. Does the record reflect that your client anywhere trained him? No, specifically there's evidence that Wanda LaCruz Jr., who was the foreman, did tell him while on the vessel to go down the hatch, to look for the hatch, make sure it was pinned properly, that the hatch door wasn't going to slam on him. And Wanda LaCruz, there are two Wanda LaCruzes, one's junior, one's senior? Yes. They both work for your client? Correct. Okay, and one of them says you've got to pin the hatch up. But, again, does anybody ever train this man? That part has not been developed in the record because it wasn't germane to any specific issue that was raised by the— Although, wouldn't one of the Ruiz factors, if it's labor fighters that's the one that trained him fully, that wouldn't be relevant? In other words, it's hard to think you've borrowed an employee if you aren't going to tell the employee what to do, other than just go down that hole. Well, Your Honor, I think that evidence is to be developed. It would be if we ever got down to it. But the issue is that labor fighters were supposed to provide some degree of training and that Jacinto Poore would also have made sure that he had the adequate knowledge to perform his jobs. And the question is, what do you need to do to train a 60-year-old blue-collar worker who's been working his entire life in the field to climb down a ladder? I mean, I think we're begging the question, what training does that really involve? I don't understand your point that labor fighters were supposed to provide some training. I mean, this is specialist work of some sort, longshoremen. What training, in your eyes, if the evidence was developed, would labor fighters have provided this sort of temp agency, sending people out, I guess, for all sorts of jobs? Jacinto, your client says, we need somebody to do X. I don't know what the request was from your client that he was the answer for. What sort of training are you suggesting that the temp agency would have done? Well, Your Honor, the evidence that they needed to do, that they were responsible for, is the question I'm really asking. Yes, Your Honor. None of that evidence is in this record. No, but what are you saying legally they would even have been obligated to do as opposed to your client doing? Contractually, there was an agreement and a practice and a procedure whereby Jacinto Poore provided videos, training manuals, instructions on two labor finders for general laborers such as Mr. Alvarado. He says he didn't see any videos. He says he wasn't trained. He says there was no shoreside training. That's where we're at. But they were JPI videos and materials? They were JPI videos and training and materials? I believe so, Your Honor. I believe that this was part of that relationship that labor finders and Jacinto Poore had. You're saying labor finders should have pushed play on the video, basically, but it would be a JPI training program. Yes, Your Honor. Understanding all that was provided to labor finders. But what was labor finders to do independently of what JPI provided? I'm not aware of any independent duty other than make sure that they had a reasonably fit person that could perform work in the field. So, you know, backing up, the issue of the agreement, there's no doubt that there's a written agreement. This is as structured a relationship as one can imagine whereby the day before, the record shows that Jacinto Poore said, we need six laborers to report to the SAFIRE on the 12th. Pursuant to that, labor finders, in pursuit of the contract, provided these laborers to the vessel. And labor finders' only involvement was to tell Mr. Alvarado to report to Mr. De La Cruz ashore and that Jacinto Poore would take it from there. There's absolutely no evidence in this record that Mr. Alvarado received any instructions from anybody employed by labor finders once he arrived at the Jacinto Poore facility. The sole evidence in the record is that everybody present in that crew was a Jacinto Poore employee. Juan De La Cruz, who's at the shore, told him to follow some people onto the boat, sign in. He told him to follow Juan De La Cruz, Jr., who checked him in and gave him the instruction and gave him the orders to go down the hatch. There's no evidence there was any labor finder's person involved. Mr. Alvarado is confused about who gave him instructions, but he does say he doesn't know who this mystery person Jesse is. And so there is absolutely no evidence that labor finders retained any control and gave him any instruction once he arrived at the Jacinto Poore facility. The under-controversial evidence is that there are no labor finders' representatives anywhere on the facility, let alone on the vessel. So given, you know, this is a standard temporary employee-staffing company relationship, where under those circumstances the cases such as Capps, Chaubert, all have recognized that, in particular, the... Counsel, I'll give you one minute to wrap up. Oh, I'm sorry. I didn't realize it was read. The Capps case, the Chaubert case, in those cases the employees were injured on the first and second day that they were employed at the job. And the court said it didn't matter. Since they knew they were working for a staffing agency, they knew that they would be seated on and lent to another employer. Thank you, Your Honor.  Jacinto Poore's position that the evidence was not developed as to the training is not entirely accurate because what we find in page 1122 of the record, Jacinto Poore's own safety man testifies that labor finders were responsible for training its own people. He also testified that for the jobs that they were to do, Jacinto Poore would provide some limited tools, in this case basically just gloves, but if the stevedores from labor finders needed additional equipment like fall protection, safety harnesses, and lanyards, labor finders were responsible for providing that, and that's on page 1123 of the record in Jacinto Poore's safety man's deposition. The contract between labor finders and Jacinto Poore also incorporated some policies and safety inspection requirements, things of that nature, and one of labor finder's safety policies stated that labor finders would conduct inspections of these working areas to ensure that, number one, their workers are working safe, two, that they're wearing PPE, three, that the work site is free of hazards pursuant to this OSHA general duty clause, and number four, that their workers are doing their contracted job. So clearly labor finders never disclaimed control over the folks that they sent over to help Jacinto Poore with their work, and under that scheme, there's... Is the record clear that this individual, Jesse, was a labor finder's employee? It's not clear, Your Honor. Is there any record evidence that anyone from labor finders was at the vessel? No. The only exposure that Mr. Alvarado had with respect to the day of the vessel was the day before he arrived. He was told by labor finders where to go and when to arrive, and so he was told over the phone by labor finders go to pier number three, arrive at 7 a.m. That's the extent of labor finder's physical existence. With our focus or the questions that were focused on who trains, which of the Ruiz factor would that implicate, if any? That would go to control, Your Honor, because the control is the question of whether the employer is exercising the type of non-deliverable continuous duties that one would expect an employer of an employee to be responsive for, the duty to supervise, the duty to train, to provide competent co-employees, provide necessary instrumentalities to perform work safely. Those are the traditional duties of an employer, and so that training aspect, providing safety policies, providing inspections, ensuring that they're doing their work, all inform the control duty because the control is that of a master and a servant relationship. And so for that reason, there is a dispute issue of fact. Going back to the SAFIRE turnover duty, Judge Higginson, I thought more about your question about is it a categorical issue that when there's an unguarded hole in a divided chute, whether that's always going to be a danger? And I don't think that's necessarily true, but I do think it is a question of fact for the jury to decide, considering that we have submitted expert testimony regarding the need to warn about the configuration of that chute in order, as part of the toolbox talks for job safety analysis that is industry standard in the maritime industry, and that was not done in this case. There's a plethora of record evidence to show that Mr. Alvarado was never provided any kind of a safety meeting. There's no evidence that the safety meeting was documented, even though that is industry standard as well. Wouldn't that have been JPI to have done the safety meeting? Correct, Your Honor. And so the superintendent of Justinoport also testified that he had no recollection that there was ever a safety meeting with, number one, with the vessel to get the download about, well, what do we need to know about the ship? Nor is there record evidence that Justinoport had a safety meeting with any of their stevedores, in part because their safety man was late and didn't arrive and couldn't be contacted. And so the record evidence supports that there was no safety meeting provided to Mr. Alvarado, and more importantly, for purposes of the turnover duty, the configuration of the vessel and getting to the cargo hold was not communicated to Justinoport by the ship, which is part of that turnover duty. And, Judge Wilson, going to your point about the open and obvious issue, I just want to note that for purposes of the active control duty, the open and obvious is not an element, it's not defense to that duty. It doesn't matter what a reasonable stevedore should or would know. What matters is whether the vessel maintains active control over that part of the vessel. And, Judge Southwick, under the Turner opinion, this court held that where there is such as a deck or some other part of the vessel where the stevedore has to traverse in order to get to his working area, that is something that can be under the vessel's control, and the evidence of that is things like whether they have the right to control access. Like, for example, in this instance, the captain of the ship testified that he threw the Justinoport safety man off of the ship and prevented him from taking photographs after the incident of the shoot. And so that right of access, that right of control is some evidence that the vessel maintained active control over the shoot as opposed to having turned it over completely to Justinoport, which would be the standard for finding that there is no active control over that particular part of the vessel. And for those reasons, we ask you to reverse. I'm fine to go through.